IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PROTECTIVE OPTICS, INC.,

        Plaintiffs,

   v.

PANOPTX, INC.,

        Defendant.

                              /

No. C 05-2732 CRB

**MEMORANDUM AND ORDER**

      Protective Optics, Inc. ("Protective") filed suit against Panoptx, Inc. ("Panoptx") for infringement of U.S. Patent No. 6,062,688 ("the '688 patent"). The parties filed a Joint Claim Construction Statement asking that the Court construe four claim terms.

**BACKGROUND**

      The '688 patent, entitled "Detachable Eyeglass Foam Shield," discloses an eye shielding system to prevent liquids and solids from entering the face area behind eyeglasses. The patent was issued May 16, 2000, to Mr. Joseph Vinas. By assignment, Protective Optics, Inc. is the owner of the entire right, title, and interest of the '688 patent.

The relevant patent claims are directed to an "eye shield system," and the "shield" itself.[1] Generally, the system includes an air-permeable shield that is releasably secured to the frame of eyeglasses. When the system is worn, the shield sits between the entire perimeter of the frame and the wearer's face. The purpose of the shield is to "block," "resist," or "prevent" the passage of liquids and solids from reaching the eyes. The shield is formed from air-permeable material to allow the passage of gases so as to prevent fogging of the lenses.

The patentee described shields known in the prior art, and asserted that these systems did not meet all of the needs of persons who must wear prescription glasses and are subject to the risk of harmful substances coming in contact with their eyes. For example, prior art shields suffered from one or more of the following characteristics: not being detachable, not providing continuous coverage around the periphery, leaving a gap between the shield and the face, or not being air-permeable. According to the patentee, the invention is designed to surmount all of these prior shortcomings.

**DISCUSSION**

**I.     Legal Standard for Claim Construction**

Claim construction is a matter of law for the court to decide. Markman v. Westview Instruments, Inc., 57 F.3d 967, 979 (Fed. Cir. 1995), aff'd, 517 U.S. 370, 372 (1996). When construing claims, a court first looks to intrinsic evidence of record, and thereafter, if appropriate, to extrinsic evidence. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). Intrinsic evidence comprises the patent claims, the specification, and, if entered into evidence, the prosecution history. Id. Intrinsic evidence also comprises the prior art cited in a patent or during the prosecution. Kumar v. Ovonic Battery Co., 351 F.3d 1364, 1368 (Fed. Cir. 2003). In most cases, the intrinsic evidence alone will determine the proper meaning of the claim terms. Vitronics, 90 F.3d at 1583.

---

[1] Protective alleges that certain Panoptx products infringe claims 1, 2, 8, 10, 15-18, 20, and 42; the terms to be construed are present in claims 1, 15, 16 and 42.

When construing claims, the analysis begins with, and must focus on, the language of the claims themselves. Interactive Gift Exp., Inc. v. Compuserve Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001). If the claim language is clear on its face, then the rest of the intrinsic evidence is considered only for whether any deviation from the plain meaning is specified. Id. Deviation may be warranted if, for example, the patentee has "chosen to be his own lexicographer," or if the patentee has disclaimed a certain portion of the claim scope that would otherwise be afforded by the plain meaning. Id. (citations omitted). Where the claim language is not clear, other intrinsic evidence is used to resolve the lack of clarity. Id.

Generally, a court gives the words of a claim their ordinary and customary meaning. Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Id. at 1313. The context in which a word appears in a claim informs the construction of that word. Id. at 1314. Where there are several common meanings, the patent disclosure "serves to point away from the improper meanings and toward the proper meanings." Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc., 334 F.3d 1294, 1300 (Fed. Cir. 2003) (citation omitted). If more than one definition is consistent with the usage of a term in the claims, the term may be construed to encompass all consistent meanings. Texas Digital Systems, Inc. v. Telegenix, Inc., 308 F.3d 1193, 1203 (Fed. Cir. 2002).

Claims must be read in light of the specification. Markman, 52 F.3d at 979. The specification "is the single best guide to the meaning of a disputed term." Vitronics, 90 F.3d at 1582. Where a claim term has multiple, yet potentially consistent, definitions, the rest of the intrinsic record, beginning with the specification, provides further guidance. Brookhill-Wilk, F.3d at 1300. If the patentee explicitly defined a claim in the specification, that definition trumps the ordinary meaning of the term. CCS Fitness v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002). The specification may define a term by implication. Phillips, 415 F.3d at 1321. The specification may also reveal a disclaimer of the claim scope by indicating that the invention and all of its embodiments only occupy part of the broad

3

meaning of a claim term. <u>SciMed Life Sys. v. Advanced Cardiovascular Sys.</u>, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001).

It is error, however, to import a limitation from the specification into the claim. <u>Liebel-Flarsheim Co. v. Medrad, Inc.</u>, 358 F.3d 898, 904 (Fed. Cir. 2004). Standing alone, an embodiment disclosed in the specification does not limit the claims. <u>Id.</u> at 906. Even when the specification describes only a single embodiment, the claims of the patent are not to be construed as restricted to that embodiment unless the patentee demonstrates a clear intention to limit the claim scope using "words or expressions of manifest exclusion or restriction." <u>Teleflex, Inc. v. Ficosa N. Am. Corp.</u>, 299 F.3d 1313, 1327 (Fed. Cir. 2002). Absent clear statements of scope, courts are constrained to follow the language of the claims and not that of the written description provided by the specification. <u>Id.</u> at 1328; <u>see also</u> <u>Specialty Composites v. Cabot Corp.</u>, 845 F.2d 981, 987 (Fed. Cir. 1988) (stating a limitation should not be read into the claims unless a specification so requires).

Conversely, a construction that excludes a preferred embodiment is "rarely, if ever, correct." <u>Pfizer Inc. v. Teva Pharm., USA, Inc.</u>, 429 F.3d 1364, 1374 (Fed.Cir. 2005) (quoting <u>Sandisk Corp. v. Memorex Products, Inc.</u>, 415 F.3d 1278, 1285 (Fed. Cir. 2005)). Courts require highly persuasive evidence that the claims do not encompass a preferred embodiment. <u>Vitronics</u>, 90 F.3d at 1583.

**II.    Construction of the Disputed Terms**

    **A.    The Terms**

The parties have requested the Court to construe the following terms:

| | |
|---|---|
| (1) "blocks passage of liquids and solids" | claims 1 and 42 |
| (2) "to seal" or "a seal" | claims 1 and 16 |
| (3) "resists passage of liquids and solids" | claim 15 |
| (4) "prevent the passage of liquids and solids"[2] | claim 42 |

---

[2] The claim language reads "solid and liquids." '688 patent at 14:5.

4

The first and third terms are both used to modify the description of the air-permeable material that forms the shield, and will be analyzed together. The fourth term is used in the context of how the shield "engage[s] with a wearer's face." The second group of terms uses the word "seal" as a verb and a noun, also in the context of how the shield contacts the wearer's face.

The primary dispute between the parties is the degree to which the shield material, and the point of contact between the shield and the face of the wearer, each affect the ability of liquids or solids to breach the eye shield system. Panoptx argues that the claim terms all require that the material and the seal formed between shield and face must be essentially "impenetrable." In contrast, Protective contends that the seal and the material need not function in such an absolute manner. Protective contends that the construction proposed by Panoptx impermissibly imports a single embodiment described in the specification into the claims. The following analysis considers as intrinsic evidence the claims and the specification.[3]

**B.     "Blocks" and "Resists"**

**1.     The claim terms and proposed constructions**

Claims 1, 15, and 42 contain the terms "blocks" and "resists" and recite, in relevant part:

> 1. . . . a shield, comprising an air-permeable material, having left and right ends, and forward and rearward sides, wherein the air-permeable material allows passage of gasses, but <u>blocks passage of liquids and solids</u>, and the shield has two lens openings formed therein . . . .

'688 patent at 10:1-5 (emphasis added).

---

[3] Panoptx alluded to the prosecution history in the Joint Claim Construction Statement, but made no further argument based on the file history in its response brief or at oral argument. Because the prosecution history is not in evidence, the Court will give it no further consideration.

> 15. . . . a shield structure, comprising an air-permeable material, having forward and rearward sides, wherein said air-permeable material allows passages of gasses, but <u>resists passage of liquids and solids</u>, said forward side has at least one lens opening formed therein, and said forward side is operable to be releasably secured to the rearward side of the frame . . . .

Id. at 10:64 - 11:4 (emphasis added).

> 42. . . . a unitary body configured to fit interstitially between a pair of eyeglasses and a wearer's face, said unitary body comprising an air-permeable material that <u>blocks the passage of solids and liquids</u> therethrough . . . .

Id. at 13:33-36 (emphasis added).

Preventive proposes a construction of "impedes" for the term "blocks," and "hinders" for the term "resists." Panoptx contends that both terms should be construed to mean "stops or does not allow the passage of liquids or solids." In other words, Panoptx would require that the shield material be impermeable to liquids and solids, while Protective would construe the terms to mean less than an absolute barrier.

### 2. Plain meaning of the claim

The claim limitations recite, respectively, a "shield," a "unitary body," and a "shield structure" as the main element, and then further recite limitations on the structure and function of that element. In each case, the main element comprises a material possessing certain properties. Each claim limitation requires that the material both (i) permit gas to pass through, but (ii) not permit liquids or solids to pass through. The notion that liquids or solids are not permitted to pass through is expressed by the verbs "blocks" and "resists."

The plain meaning of both of these terms ranges from the absolute, such as, "completely blocks" or "absolutely resists," to the passive, in which an obstacle is present, but simply slows the passage around or through the material. The fact that gases may pass through the material indicates that the material is not impervious to all matter, but instead acts more like a filter that stops different matter to different degrees. The fact that the invention requires at least some breach of the shield undermines an interpretation of the

6

claim as requiring complete blockage or absolute resistance, at least with respect to liquids, because liquids, like the gases that are required to pass through, are fluids.  One of skill in the art would not read the claim as ruling out the possibility that a liquid would be able to wick through the material.  The plain meaning with respect to solids is different, however.  If liquids are "blocked" or "resisted," one would readily infer that solids are blocked or resisted to a greater degree, tending more towards absolute blockage.  The skilled artisan would also understand this tendency to hold for liquids as they become more viscous.

The plain meaning of "blocks" or "resists," when not used in an absolute sense, also implies an element of time.  That is, the material blocks liquids or solids from immediately traversing the material, but over time, they may in fact be able to do so.  To "resist," or to "block" the passage also carries the connotation that the substances will eventually, or gradually, pass around or through the material.

In certain senses, the two terms are distinguishable. "Blocks" also carries the meaning of a physical barrier that prevents a direct hit.  To get beyond a blocking barrier requires circumventing the barrier.  In contrast, "resist" suggests that the body of the object that prevents passage ultimately allows passage through the object itself.

In short, the plain meaning of the claim encompasses the constructions proposed by both parties.  Although the proposed terms differ significantly in scope, the claim language does not suggest that only one or the other is the correct construction.  Note, too, that the degree of resistance offered by the material, and thus the characterization of the degree of prevention implied by "blocks" or "resists," depends on the nature of the substance coming into contact with the shield.  Thus, the plain meaning of the claim limitations for both "blocks" and "resists" is that the material provides a range of protection against the passage of liquids and solids, from protection for a period of time, to protection against direct ingress, to an absolute bar to passage.  See Texas Digital Systems, 308 F.3d at 1203 ("If more than one dictionary definition is consistent with the use of the words in the intrinsic record, the claim terms may be construed to encompass all such consistent meanings.").

### 3. Specification

7

The specification does not explicitly define the terms. Nor does it disclose a rate by which any substance was contemplated to pass through the shield material. The specification also does not distinguish between the degree of protection afforded against liquids and solids. Instead, the ability of the material to withstand the passage of substances is to be inferred from the stated functions and exemplary intended uses of the invention.

First, the patent specifies that the shield is to be made of material permeable to air to the extent that fogging of the lenses of the eye protection system is "inhibit[ed]." '688 patent at 2:25. The patentee further emphasizes that one function of the invention is to "permit enough air to pass through it, so that it inhibits the fogging up" of the glasses. Id. at 2:53-56. This degree of permeability notwithstanding, the system is "particularly useful for providing protection for surgeons or other medical personal from splashed liquids or solids."[4] Id. at 2:25-27. The specification continues, "[i]t is also useful for any workers who must wear some protective shield for their eyes." Id. at 2:27-29. One specific example noted by the patentee is that the invention can be used for protection from splashed bodily fluids that may carry the AIDS virus. Id. at 2:29-32.

Panoptx contends that the claims must be read to "keep out all contaminants . . . like the HIV virus." The more natural reading of the specification is that the shield protects against a splash directly hitting the eye region, but does not absolutely block or resist the passage of fluids. Absolute protection against all contaminants is not required by the claims and the specification makes no such restriction. The shield "blocks" or "resists" fluid from directly entering, but nothing in the specification requires that the material be impermeable. Some materials may be capable of absolutely blocking out fluid, but the invention is not limited to such materials. The fact that the material is required to allow gas to pass through means that openings exist. The specification does not preclude the reasonable inference that fluids may wick through the material over some period of time.

---

[4] This passage in the "Background" section is directed to both the ability of the material itself to withstand passage of substances, as well as the conformal fit of the shield to the face in serving as a protective seal.

8

1   To read the claims as requiring the material to "keep out all contaminants" would
2   impermissibly import into the claims an inference based on a single embodiment.  The
3   specification introduces two broad areas of use for the eye shield system: (i) surgeons or
4   medical personal, and (ii) any workers who must wear some protective shield.  For neither
5   application does the patentee indicate in the specification that absolute blockage is necessary,
6   nor does the plain meaning of the claim suggest it.  Such a reading is inferred by Panoptx
7   based on a preferred embodiment that the shield is to protect from viruses carried in splashed
8   liquids.  Even if the inference as to what would satisfy the goals of the preferred embodiment
9   were correct, without "words or expressions of manifest exclusion or restriction," the claims
10  are not to be restricted to any single embodiment.  Teleflex, 299 F.3d at 1327.  Accordingly,
11  the scope of the terms "blocks" and "resists" is not to be set by the embodiment of eyewear
12  for a surgeon needing to prevent contamination.

13  Furthermore, to infer that protection from viruses requires absolute blockage is to
14  neglect alternative means of achieving protection that are consistent with the claims.
15  Specifically, another limitation in these claims requires that the shield be releasable or
16  detachable.[5]  The specification teaches that "one desire" of the invention is that the shield be
17  "low cost" so that it can be regarded as disposable.  This is said to be particularly important
18  "in a medical situation."  Wearers can still be protected from contaminants that enter the
19  material, and that might eventually pass through, by removing the shield and disposing of it.
20  Thus, a claim interpretation that permits the shield material to be less than an absolute barrier
21  is fully consistent with the disclosed embodiments.  Pfizer, 429 F.3d at 1373 ("[I]t is
22  necessary to consider the specification as a whole and to read all portions of the written
23  description, if possible, in a manner that renders the patent internally consistent.").  Panoptx'
24  proposed construction reaches for a particular interpretation of how the invention should
25  function that is neither suggested by the claims or the specification, nor required to practice
26  the invention.

---

[5] Claims 1 and 15 recite a "retainer for releasably securing the shield," '688 patent at 10:10, 11:5, and claim 42 requires the shield to be "adapted for releasable engagement," id. at 14:2.

9

### 4. Conclusion

The terms "blocks [the] passage of liquids and solids" and "resists passage of liquids and solids"[6] mean that the shield material "substantially blocks" or "substantially resists" the passage of liquids and solids. See Playtex Products, Inc. v. Procter & Gamble Co., 400 F.3d 901, 907 (Fed. Cir. 2005) ("The term 'substantial' is a meaningful modifier implying 'approximate' rather than 'perfect.'" (quoting Liquid Dynamics Corp. v. Vaughan Co., Inc., 355 F.3d 1361, 1368 (Fed. Cir. 2004)). An equivalent expression of the construction is that the material "stops the direct passage of, but is not impermeable to, liquids and solids." The material is not required to "block" or "resist" <u>absolutely</u> the passage of liquids and solids.

### C. "Prevent"

#### 1. The claim term and proposed constructions

The relevant portion of claim 42 recites:

> 42. . . . said shield having forward and rearward edges, said forward edge being adapted for releasable engagement upon a rearward side of a pair of eyeglasses and said rearward edge adapted to engage with a wearer's face and <u>prevent the passage of solid and liquids</u> therebetween . . . .

'688 patent at 14:1-6 (emphasis added).

Preventive proposes a construction of "hinder" for the term "prevent," based in part on dictionary definitions that denote several degrees of meaning. Panoptx contends that the phrase should be construed, as for "blocks" and "resists," to mean "stops or does not allow the passage of liquids or solids." Panoptx argues this construction would be consistent with the alleged overall purpose of the invention, and because "blocks" and "prevent" both appear in claim 42 they should have the same meaning.

#### 2. Plain meaning of the claim

---

[6]Note that "resists passage of liquids and solids" is the only construed term of claim 15. The limitation of "a seal" found in dependent claim 16 is not present and is not to be read in. Phillips, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to the presumption that the limitation in question is not present in the independent claim.").

The ordinary meaning of "prevent" is to "keep from occurring." Globetrotter Software, Inc. v. Elan Computer Group, Inc., 362 F.3d 1367, 1380 (Fed. Cir. 2004) (citing Random House Webster's Unabridged Dictionary 1535 (2d ed. 1998)). The claim recites that the rearward edge of the shield is adapted to engage the face so as to keep liquids and solids from passing between the face and the shield edge. Thus, the claim language is focused on the properties of the rearward edge, and the importance of achieving conformal contact between the shield system and face. By this contact, the shield is intended to "prevent" seepage along the interface by preventing gaps from appearing at the interface between face and shield. The claim language does not require any other mechanism, such as applying pressure to keep the shield against the face, to ensure that such a gap does not open or that the interface is resistant to seepage. Thus, the plain meaning of "prevent" as used in the claim is to stop the passage of solids and liquids between the shield and the face.

The claim language, however, is not clear about the degree to which the shield edge stops fluids and solids. This uncertainty arises because of the range of meanings associated with troponyms of "prevent." Manners of "preventing" include: deflect, avert, obstruct, hinder, thwart, frustrate, baffle, stop and block. WordNet: An Electronic Lexical Database (Christiane Fellbaum, ed., MIT Press 1998), available at http://wordnet.princeton.edu; see also Sightsound.com Inc. v. N2K, Inc., 391 F. Supp. 2d 321, 334-35 (W.D. Pa. 2003) (concluding based on the breadth of definitions in multiple dictionaries that "prevent" incorporates both the "concept of absolutely stopping . . . as well as merely hindering the event" by making it difficult for the event to occur). Given this range of possibilities, it becomes necessary to consult the specification to determine the scope of the invention. Interactive Gift Exp., 256 F.3d at 1331.

### 3. Specification

The critical question is whether the invention, as described by the specification, requires the shield edge to absolutely prevent the passage of materials between the face and shield, such that it would be appropriate to limit the claim accordingly. An objective of the eye shield system is to provide a sufficient fit "between the shield and the face to adequately

11

protect the eyes from materials splashed onto the face." '688 patent at 2:42-43.  The shield is to be "resilient and to mold itself to the contours of the face, thus creating a seal preventing entry into the protected area of either liquids or solids splashed on the face." Id. at 3:15-18.

Consideration of the specification as a whole indicates that the eye shield system is not intended to be perfect.  First, the words used by the patentee in the summary of the invention, "adequately protect," indicate a tolerance for less than absolute protection. The plain meaning of adequate itself admits of a variable degree of protection that is commensurate with the circumstances.  The specification contains no explicit notice that the eye shield system must only provide the highest level of protection, that is, it must be an impermeable shield.  Protection adequate to the needs of "any workers who must wear some protective shield" is within the scope of the claim.  Therefore, less-than-impermeable shielding is part of the invention.

Second, the lack of any mechanism to ensure a tight, secure fit of the eye shield system to the head and face of wearer also indicates a tolerance for less than absolute protection.  The means for keeping the system in place is generally described with reference to Figure 1, as follows: "[w]hile standard temple connectors are shown it is understood that the temple connectors may be of various shapes and may extend around the head of a user and may be adjustable.  Any of these types of temple connectors that hold and retain the eyeglasses or eye goggles on a user's head are acceptable." '688 patent at 4:5-10.  Based on this description, one of skill in the art would not understand the invention to require positively securing the shield against the face by anything more than the downward angle of a standard temple connector pressing against the rim of the ear.  Gas masks and safety goggles known in the art that do absolutely prevent the entry of liquids require more secure retention means in order to create such a seal, but this invention lacks any such teaching or limitation.

Where a claim is expressed in general descriptive words, the court will not put a narrowing modifier before an otherwise general term that stands unmodified in a claim. Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1249-50 (Fed. Cir. 1998).

1  "Prevents" connotes a range of degrees of "keeping from occurring." Panoptx' preferred reading would essentially require the claim to be rewritten as "absolutely prevents." Absent clear indication in the specification to justify this narrowing interpretation, and in view of the invention as understood as a whole, the broader interpretation is preferred.

### 4. Conclusion

The term "prevent the passage of solids and liquids" as used in claim 42 means to "substantially stop the passage of solids and liquids."[7] See Playtex Products, 400 F.3d at 907. The rearward edge engages with the face to stop, although not to the degree of absolutely stopping, the passage of liquids and solids at the interface. The specification does not require the term to carry only the most restrictive meaning that the rearward edge of the shield "not allow" the passage of liquids or solids.

### D. "To Seal" and "A Seal"

#### 1. The claim terms and proposed constructions

Claims 1 and 16 recite in relevant parts:

1. . . . wherein said shield's forward side abuts the frame's rearward side and said shield's rearward side contacts the face of the wearer of the frame to seal with the wearer's face . . . .

'688 patent at 10:6-9 (emphasis added).

16. . . . wherein the shield structure is resilient and extends rearwardly to form a seal with the wearer's face.

Id. at 11:7-9 (emphasis added).

---

[7] Claim 42 incorporates the two construed terms "blocks passage of liquids and solids" and "prevent passage of liquids and solids." The two should not, simply because they appear together in the claim, have the same meaning. In fact, the presumption is the opposite. See Innova/Pure Water, 381 F.3d at 1119; Pickholtz v. Rainbow Technologies, Inc., 284 F.3d 1365, 1373 (Fed. Cir. 2002). Here, the two refer to different protective modalities. "Blocks" modifies the shield material itself, whereas "prevents" is a limitation on the interface between shield and face. That both are construed in a similar sense – stopping, but not absolutely – is not to say they have the same meaning. The different modes, made operational by different principles, are however understood to achieve a similar degree of performance from the intrinsic evidence, read as a whole.

Preventive proposes the verb "to seal" should be construed as "to fit snugly or mold with another surface so as to hinder the passage of liquids and solids," and the noun "seal" should be "a means of hindering the passage of liquids and solids." Panoptx contends that the terms should instead mean "to create a tight and impenetrable barrier or closure preventing entry," and "a tight and impenetrable barrier or closure preventing entry," respectively. Again, Preventive seeks a construction with "hinder" as the operative term connoting less than a perfect seal, whereas Panoptx offers the absolute terminology of "impenetrable barrier."

### 2. Plain meaning of the claim

The ordinary meaning of the verb "to seal" is to: make tight, secure against leakage, close, or close hermetically. Even though this word admits of less of a range in the degree of closure, a range is nonetheless discernable. It is undisputable that "to close," and "to close hermetically" carry different connotations. Thus, it is reasonable to question whether the claim term should be restricted to the more stringent interpretation offered by Panoptx, or whether it carries a broader, less absolute meaning.

The ordinary meaning of the noun "a seal" is: a device that prevents leakage, or an airtight or watertight closure. Again, a range of meaning is present. The shield material itself is air permeable, although there is no indication that it need be watertight. Whether either or both of these conditions apply to the interface between the shield and the face, where "the seal" in question is formed, is not apparent from the language of the claims.

The rest of each claim limitation provides the context for what is making the seal. Again, it is the shield's rearward side, where it contacts the face of the wearer, that is forming the seal. Note that it is this same contact between the rearward side of the shield and the face that is said to "prevent the passage of liquids and solids." See supra Part C. The terms "seal" and "prevent" do not appear within the same claim, however, and thus are entitled to the presumption of a difference in meaning and scope. Power Mosfet Technologies, L.L.C. v. Siemens AG, 378 F.3d 1396, 1409-10 (Fed. Cir. 2004). Nonetheless, because the claim language itself does not resolve the ambiguity regarding the degree to which the shield seals

to, or forms a seal with, the face, the specification is again consulted for the context of the invention.

### 3. Specification

The key question is whether by the term "seal" the patentee was claiming an eye shield system that is "leakproof" at the point of contact between shield and face as the invention. In the specification the phrase "seal or fit snugly" appears numerous times. '688 patent at 1:22, 2:12, 20, 41. A duo of terms given in the alternative normally implies that each word or phrase carries a distinct meaning. See Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc., 381 F.3d 1111, 1119 (Fed. Cir. 2004). Within this pair, "seal" would carry a more stringent meaning than "fit snugly." However, any distinction between these two is blurred by the passage in the specification teaching that the shield "must fit snugly to both the face and the frame of the eyeglasses or goggles, thus creating a seal." '688 patent at 2:50-52 (emphasis added). A "snug fit" does not necessarily connote a leakproof seal, but an object that "fits snugly" does at least amount to a "close contact with another surface" that can be described as a seal. Other uses in the specification of the term "seal," as either a noun or a verb, also fail to specify the degree to which a leakproof fit is required.

The discussion above for the term "prevents" is also relevant to this construction. The specification interrelates the two terms, for example, "a seal preventing entry," '688 patent at 3:16, and nowhere does it indicate they carry distinguishable connotations. "Where neither the plain meaning nor the patent itself commands a difference in scope between two terms, they may be construed identically." Power Mosfet, 378 F.3d at 1410 (citation omitted).

Again, viewing the invention as a whole, the eye shield system is not intended to be restricted to perfect systems. "Seal" generally implies a tight, secure contact that does not permit leakage. In the context of this invention, however, nothing in specification explains that the terms "to seal" has any different meaning than "to prevent" as these terms relate to the interface between the shield and face. As with the teaching relating to the term "prevents," the allowance of a mechanism for wearing the glasses that does not ensure a positive, secure fit against the face also would lead one of skill in the art to understand that

15

the "seal" at the interface need not be absolute. Nowhere is it explained that "a seal" does anything more than "prevent" the passage of liquids to the degree construed above. Furthermore, although the condition of a "leakproof seal" may be established periodically, or even nearly continuously, the language of the claims and the specification does not establish that an "absolute seal" must be created <u>and</u> maintained by the shield system.

### 4. Conclusion

The term "to seal," as used in claim 1 means "to make contact with another surface so as to substantially stop the passage of solids and liquids." <u>See</u> <u>Playtex Products</u>, 400 F.3d at 907. The related term "a seal," as used in claim 16 is "a means for substantially stopping the passage of liquids." <u>See</u> <u>id.</u> The rearward edge contacts the face to seal, or form a seal, that largely stops, although not to the degree of absolutely stopping, the passage of liquids and solids at the point of contact. The specification does not require the term to carry only the most restrictive meaning that the contact between the shield and face "not allow" the passage of liquids or solids.

**IT IS SO ORDERED.**

Dated: October 23, 2006

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE